[Cite as *State v. Smith*, 2022-Ohio-1345.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 29205 |
| | : | |
| v. | : | Trial Court Case No. CRB 2100774 |
| | : | |
| KEONA SMITH | : | (Criminal Appeal from |
| | : | Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

· · · · · · · · · · ·

O P I N I O N

Rendered on the 22nd day of April, 2022.

· · · · · · · · · · ·

ERIK R. BLAINE, Atty. Reg. No. 0080726, City of Vandalia Prosecutor's Office, 245 James E. Bohanan Memorial Drive, Vandalia, Ohio 45377
    Attorney for Plaintiff-Appellee

LUCAS W. WILDER, Atty. Reg. No. 0074057, P.O. Box 574, Dayton, Ohio 45409
    Attorney for Defendant-Appellant

· · · · · · · · · · · ·

DONOVAN, J.

{¶ 1}  Keona Smith appeals from a judgment of the Vandalia Municipal Court, which convicted her of one count of theft following a bench trial, in violation of R.C. 2913.02(A)(1), a misdemeanor of the first degree.   Smith was fined $25 and ordered to pay court costs.   We hereby affirm the judgment of the municipal court.

{¶ 2} Smith was charged by way of complaint on April 20, 2021, and she pled not guilty.   A trial was held on June 28, 2021, at which the following evidence was presented. (At the start of the trial, Smith rejected the State's offer to reduce the theft offense to the lesser included offense of unauthorized use of property.)

{¶ 3} Cody Sanders had been employed at the Walmart on York Commons Boulevard in Butler Township as an Asset Protection Associate on April 15, 2021.   He testified that, upon his arrival at the store that day to start his shift around 1:26 p.m., he observed Smith with a cart full of clothes, "which for us, being a high theft store, is kind of unusual due to all the theft we get so [he] decided to [further] observe" Smith.   Sanders stated that Smith was riding around the store in an "electric cart," and that he observed her select a necklace and hat.   According to Sanders, Smith "tore" the UPC off the necklace and the hat; she then put the necklace on around her neck, took her "shower cap" off, and put the hat on her head.   Sanders explained that the UPC is the barcode used to scan an item at checkout.

{¶ 4} Sanders testified that Smith proceeded to a register and paid for the items in her cart but did not pay for the necklace and hat; Smith then proceeded to the grocery section of the store, looked around, and then exited the store, passing all points of sale. Sanders stated that he and another Walmart employee approached Smith outside the

store, identified themselves, and told Smith that they need to talk with her in the Asset Protection Office about the theft that she had just committed. According to Sanders, Smith admitted that she had not paid for the hat or the necklace, but she also stated that she had no identification, which led Sanders to call Butler Township to help with her identification. Sanders testified that Smith told him that she had torn the tag off the hat "in order to better wear it."

{¶ 5} Sanders identified a video created by him of Smith's activities while in Walmart. He testified that Smith had proceeded to a checkout attended by a WalMart employee, as opposed to a self-checkout, and that she had never removed the necklace or the hat or indicated to the cashier that she "had the items on her person and would like to pay for them." Sanders stated that the total value of the necklace and hat was $14.89. He also stated that he had reviewed the receipt from Smith's transaction, and the necklace and hat were not listed.

{¶ 6} On cross-examination, Sanders testified that Smith was apprehended at 2:25 p.m. When asked how long Smith had worn the necklace and hat in the store, Sanders responded that he did not recall the exact time that she had put either of those items on in her head, but she had continued to wear them up until the time he approached her when she left the store. He stated that Smith's bill for the items she had paid for was $178.

{¶ 7} Officer James Hawkins[1] testified that he was on duty on April 15, 2021, and was dispatched to the Walmart on York Common Boulevard; he identified Smith and

---

[1] Hawkins did not specifically identify his place of employment.

observed the video recordings of Smith in the store. Hawkins stated that Sanders had completed a complaint for the theft and a Criminal Trespass form.

{¶ 8}  Smith testified that on April 15, 2021, she went to Walmart to exchange some shorts; after she finished shopping, she went to Customer Service to make the exchange. According to Smith, shoppers can often purchase items at Customer Service, but on this day the Customer Service employee would not let her do so, and she proceeded to a register to make her purchases.

{¶ 9} When asked what she was doing with the necklace and the hat, Smith testified as follows:

> I was trying on the hat because as you can see I have a wig on and it's braids and I had a bonnet on. So I took the bonnet off to see if the hat fit. And the hat didn't fit so I seen that it had a pull part that you can adjust the hat but connected to the pull part was a tag so it wouldn't adjust if the tag was still on there. So I un…took the tag off, put the hat on my head and I placed the [tag] in my cart, not in my purse. I didn't carry a purse in there, it was in the cart. I didn't put it anywhere else but in the cart.
>
> * * *
>
> The necklace I, just I think that it was longer than what I was showing when I first picked it up, it was a longer chain. So I said, okay, I like it. I was into these mood jewels and that's what they had on there behind the metal part. * * * But long story short, I put it on, tried it on. I said, okay, it's long enough. * * * I kept it on because I was gonna purchase it. I put

that on top of the cart.   I proceeded to go to check out.   * * *

　　　　* * *

　　　　* * * So I was done shopping.   That's when I was going to exchange the item and purchase the rest of the items.   So I gave the lady the items for exchange and asked her can I purchase the rest of the stuff.   She handed me my bag.   So clearly that say go to the other line.   So I went to the other line.

　　　　* * *

　　　　And in the process getting phone calls and stuff, interrupted, friend on my side, and, you know, I'm just like it's been a whole rough patch for me.   I just simply forgot about it.   I asked the gentleman that came and approached me can I pay for it.   It was a simple mistake, I just forgot and stuff.   I spend every bit of money, not all my money, but I just spent a nice piece of money in the store and I didn't intentionally try to take anything.   I was just going to shop, pay for my items, and go on about my way and stuff. I just know what would have turned that day around if I didn't have a lot going on, but I'm human, I make a mistake, and I told them.   I didn't deny it and stuff.   So I offered to pay for the items.   They disregarded that.

{¶ 10} At the conclusion of the trial, the municipal court judge indicated that she did not find Smith's testimony credible and found her guilty.

{¶ 11} Smith appeals, raising a single assignment of error:

　　　　SMITH'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT

OF THE EVIDENCE.

{¶ 12} Smith asserts that it was undisputed that she did not pay for the necklace and hat at the register, but it was also undisputed that she did not attempt to conceal the items; she paid for $178 worth of merchandise but mistakenly forgot to pay for a necklace and hat having a total value of approximately $14. Smith asserts that she was distracted and simply forgot to pay for the items, and she did not attempt to flee when the WalMart employees approached her. According to Smith, the weight of the evidence did not support a finding that she had intended to deprive Walmart of the necklace and hat. Smith cites *City of Cuyahoga Falls v. Ellenberger*, 9th Dist. Summit No. 21461, 2003-Ohio-6578.

{¶ 13} The State responds that *Ellenberger* is distinguishable and directs our attention to *State v. McNeill*, 2d Dist. Clark No. 2017-CA-64, 2018-Ohio-2659.

{¶ 14} In *McNeill,* we stated:

"[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness

credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, at 175.

*Id*. at ¶ 39, citing *State v. King*, 2d Dist. Montgomery No. 27432, 2017-Ohio-8910, ¶ 9.

**{¶ 15}** R.C. 2913.02(A) provides: "No person, with purpose to deprive the owner of property * * *, shall knowingly obtain or exert control over * * * the property * * * in any of the following ways: (1) Without the consent of the owner or person authorized to give consent." As we noted in *McNeill*, pursuant to the definition of "deprive" in R.C. 2913.01(C), the State could prove a shopper's intent to deprive a store of property by establishing that the shopper took property "without giving proper consideration or payment, or without reasonable justification or excuse for not giving proper consideration or payment." *Id*. at ¶ 40, citing R.C. 2913.01(C)(3).

**{¶ 16}** In *Ellenberger*, 9th Dist. Summit No. 21461, 2003-Ohio-6578, the facts were as follows:

Upon entering the store, appellant picked up a store circular detailing weekly specials, went to the cash register area, placed three packs of cigarettes in the child seat area of the shopping cart, and continued shopping. Upon finishing her shopping, appellant proceeded to the cash register. After paying for her groceries, appellant stopped outside the doors to the store to review her receipt. At that time, a security guard who had been following appellant since she entered the store approached appellant regarding the three packs of cigarettes appellant put in her cart as she began her shopping. Appellant indicated she had forgotten about the cigarettes under the circular. Appellant apologized for her oversight and offered to pay for the cigarettes. The security guard took appellant back into the store to the manager's office.

*Id.* at ¶ 2.

At trial, the security guard testified that she saw appellant put the cigarettes in her cart, followed appellant around while she finished her shopping, and watched her check out and leave the store without paying for the cigarettes. Ellenberger testified that she had shopped at that particular store twice a week for 25 years and that she had followed her normal shopping routine that particular day: she picked up a store circular as she entered the store and went to get cigarettes. She then placed the cigarettes, her wallet, keys, and the store circular in the child compartment of the grocery cart. Ellenberger testified that when she had completed her shopping and went to the register to pay, the store was busy, and she was trying to hurry so as not to hold up the line. She further

testified that the person bagging her groceries placed two bags on top of the store circular, which was on top of the cigarettes. After paying for what she thought were all of the items in her cart, she stopped immediately in front of the store doors to check her receipt.

{¶ 17} The following was significant to the Ninth District's conclusion that Ellenberger's conviction was against the manifest of the evidence:

When approached by the security guard, appellant fully cooperated. She denied intentionally taking the cigarettes from the store, and offered to pay for them. When the security guard retrieved the cigarettes, they were still in the child compartment of the grocery cart. Appellant did not attempt to conceal the cigarettes on her person. In addition, appellant did not attempt to flee the premises either after she paid for her groceries or when she was approached by the security guard. Instead, appellant stopped right outside of the doors going into the store to examine her receipt.

{¶ 18} In *McNeill,* the loss prevention supervisor for Kohl's provided the following testimony:

* * * McNeill entered the store carrying a Kohl's shopping bag, and * * * [Loss Prevention Supervisor Christine] Faisick has experience with customers attempting to conceal stolen merchandise in bags brought into the store. She testified that she observed McNeill in the Jewelry Department place a bracelet watch on her wrist, and place another one in her cart. She stated that she observed McNeill walk behind a rack of clothing in the Misses Department, and that when she emerged from behind

the rack, the Kohl's bag "was more full than it had been before." Faisick stated that she observed McNeill proceed to Customer Service and exchange merchandise. According to Faisick, McNeill then "went to the Young Girls Department, selected shorts from there." Faisick testified that McNeill then "went back to the Junior Department, where she selected three Mudd shorts," and then she went to "the Misses side registers, point of sale over there. She made a small purchase and then passed the point of sale and left the store through the first doors." Faisick stated that she, accompanied by a store manager, stopped McNeill, introduced herself, and took McNeill to her office.

*Id.* at ¶ 8.

{¶ 19} In concluding that McNeill's conviction was not against the manifest weight of the evidence, we stated:

* * * McNeill effectively communicated at trial her claimed defense that she did not intend to deprive Kohl's of the eight bracelet watches and four pairs of shorts found in her possession. The jury, however, observed McNeill testify, viewed State's Exhibits A and C,[2] and clearly determined that she removed the property at issue from Kohl's without reasonable justification or excuse for her failure to pay. In other words, the jury determined that McNeill's justification or excuse for her failure to pay for the items, namely that she "simply forgot" that the eight bracelet watches were

---

[2] State's Exhibits A and C were recordings from the store cameras.

in her possession, and that a Kohl's employee set her up by placing additional items in her bag, unbeknownst to her, were not credible.

(Footnote added.)   *Id.* at ¶ 41.

{¶ 20} As in *McNeill*, Smith expressed at trial that she had not intended to deprive Walmart of the hat and necklace in her possession.   Unlike in *McNeill*, the hat and necklace were not in Smith's shopping cart but rather were on her person when she was stopped.   While Smith testified that she intended to pay for the items but simply forgot, she intentionally removed the means by which to complete the purchase when she removed the UPC code.   Sanders testified that, after selecting the items, Smith had torn the UPC code tag off the necklace and hat, put the necklace and hat on, went to the register, and paid for the other items she had in her cart, but not the hat or necklace. Sanders further testified that Smith had gone to the grocery section of the store, then proceeded through the grocery doors "passing all points of sale."

{¶ 21} In our view, the *Ellenberger* case is distinguishable.   While Ellenberger's cigarettes were obscured from her view by the circular and two bags of groceries, the items at issue in Smith's case were on Smith's person, having been placed there after she removed their UPC codes.   The store videos were consistent with Sanders's testimony regarding his observations of Smith's conduct while in Walmart and when she was stopped after passing the point of sale.   The municipal court expressly found that Smith's testimony was not credible, and we defer to the court's credibility assessment. Having reviewed the entire record, we cannot conclude that the court lost its way and created a manifest miscarriage of justice.   In other words, the court's conclusion that

Smith, with purpose to deprive WalMart of the necklace and hat, knowingly obtained control over the items without WalMart's consent, was not against the manifest weight of the evidence.

**{¶ 22}** Accordingly, Smith's sole assignment of error is overruled.

**{¶ 23}** The judgment of the municipal court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and LEWIS, J., concur.

Copies sent to:

Erik R. Blaine
Lucas W. Wilder
Hon. Cynthia M. Heck